AO 106 (Rev. 04/10) Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

| | |
|---|---|
| FILED | LODGED |
| | RECEIVED |
| **Dec 12, 2022** | |
| CLERK U.S. DISTRICT COURT | |
| WESTERN DISTRICT OF WASHINGTON AT TACOMA | |
| BY | DEPUTY |

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )       Case No.   MJ22-5291
The Subject Premises located at 283 19th Avenue, )
Longview, Washington 98632 and described further )
in Attachment A. )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A, incorporated herein by reference

located in the _____ Western _____ District of _____ Washington _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 875(c) | Interstate communication of threats |

The application is based on these facts:

✓ See Affidavit of Special Agent Benjamin Long, continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

*Applicant's signature*

Special Agent Benjamin Long, FBI
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:   December 12, 2022

*Judge's signature*

City and state:   Tacoma, Washington        J. Richard Creatura, United States Magistrate Judge
*Printed name and title*

USAO#: 2022R01331

**AFFIDAVIT OF SPECIAL AGENT BENJAMIN LONG**

STATE OF WASHINGTON          )

                             )          ss

COUNTY OF PIERCE             )


I, Benjamin Long, a Special Agent with the Federal Bureau of Investigation, Seattle, Washington, having been duly sworn, state as follows:

**AFFIANT BACKGROUND**

1.      I am employed as a Special Agent (SA) with the Federal Bureau of Investigation, and have been so employed since 2012. I am currently assigned to the Vancouver Resident Agency of Seattle FBI. While employed by the FBI, I have investigated federal criminal violations related to high technology or cybercrime, child exploitation, drug trafficking, counter-terrorism and violent crimes including cases involving threats of violence.

2.      I am an investigative law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7).

3.      The facts set forth in this Affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement personnel; review of documents and records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of the Application for the search warrants, it does not set forth each and every fact that I or others have learned during the course of this investigation.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 **INTRODUCTION AND PURPOSE OF AFFIDAVIT**

2 4. This Affidavit is being submitted pursuant to Federal Rule of Criminal

3 Procedure 41 in support of an Application for a warrant authorizing the search of the

4 following location, as further described in Attachment A, which is attached hereto and

5 incorporated herein, for the items to be searched for and seized described in Attachment

6 B, which is attached hereto and incorporated herein:

7 a. 283 19th Avenue, Longview, Washington 98632, a single-family

8 residence (the **Subject Premises**), including any cellular phones within the residence that

9 agents have reason to believe are owned or used by Mark LEONETTI.

10 5. Based on my training and experience and the facts as set forth in this

11 Affidavit, there is probable cause to believe that Mark LEONETTI has committed

12 violations of Title 18, United States Code, Section 875(c) (Interstate Communication of

13 Threats). Those violations were committed using a device that, at the time of the

14 violations, used the phone number 971-998-5817 (the "phone number ending in -5817").

15 There is also probable cause to believe that the **Subject Premises** contains evidence, in

16 the form of evidence of LEONETTI's dominion and control and cellular phones used by

17 LEONETTI, of the aforementioned offenses. As such, there is probable cause to search

18 the locations described in Attachment A, including any cellular phone that law

19 enforcement has reason to believe is owned or used by LEONETTI, for evidence,

20 instrumentalities, or contraband of these crimes, as described in Attachment B. Obtaining

21 the information sought in this Affidavit is necessary to further the investigation into these

22 offenses.

AFFIDAVIT OF SPECIAL AGENT BENJAMIN LONG – 2
USAO# 2022R01331

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# SUMMARY OF PROBABLE CAUSE

**A.    LEONETTI's course of conduct**

6.    On March 2, 2021, at approximately 1357 hours, staff for U.S. Senator 1's[1] office notified the United States Capitol Police (USCP) Threat Assessment Section (TAS) about a voice message from the phone number ending in -5817.  The voicemail contained the statements: "If [U.S. Senator 3] is delusional. Am I here to kill [U.S. Senator 3] because I'm clinical. No, I'm not clinical. If [U.S. Senator 3] is delusional and I'm still here to kill him, I'm not clinical. [U.S. Senator 3] is delusional. I'm here to kill him for some reason related to ... [incomprehensible]."  A USCP Special Agent obtained information from AT&T Corporation ("AT&T") that the subscriber for the phone number ending in -5817 was named "Mark Leonetti" and had an address in Portland, Oregon. Call logs received from AT&T further confirmed that phone calls had been made from the number ending in -5817 to U.S. Senator 1's office.  According to AT&T, the phone call was made at a time when the phone was in the vicinity of coordinates describing a location near 285 19th Avenue, Longview, WA, which is next door to the **Subject Premises**.

7.    The USCP subsequently contacted the Vancouver Resident Agency of FBI Seattle to request investigative assistance.  The FBI and USCP located an individual named Mark LEONETTI residing in Longview, WA, with an address in public records searches listed as 283 19th Avenue, Longview, WA.

8.    The FBI subsequently contacted a detective in Washington County, Oregon, where LEONETTI was listed as having previously resided.  The detective related that according to local law enforcement records, in June 2020, Washington County Behavioral Health workers had gone to LEONETTI's residence in Oregon after a call came in.  LEONETTI tried to record the contact using his phone when law

---

[1] The names of the victim political officials have been anonymized in this affidavit.

AFFIDAVIT OF SPECIAL AGENT BENJAMIN LONG – 3

USAO# 2022R01331

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  enforcement contacted him. The detective also conveyed that Washington County's

2  Behavioral Health team had stated or noted that LEONETTI is paranoid schizophrenic.

3      9.      During an initial follow-up interview with myself and Longview Police

4  Department officers, LEONETTI denied making any phone calls to any U.S. Senators or

5  making threats.  He also acted erratically, including running back into his residence to

6  retrieve his cell phone, which he held on his shoulder during the interview while stating

7  he had "Russia" on the line.  LEONETTI did, however, confirm his phone number was

8  971-998-5817.  When asked if he intended to harm or kill U.S. Senator 3, he responded

9  nonsensically, but then said "only if justified."  Based on my familiarity with

10  LEONETTI's voice from this interview, I recognize his voice as the speaker leaving the

11  voicemails transcribed below.

12      10.     During the rest of 2021, LEONETTI went on to leave over 400 voicemails

13  at the office phone numbers for numerous U.S. Senators and Representatives of both

14  political parties.  In one such voicemail, LEONETTI stated, apparently referencing my

15  visit in March, that "potentially … someone has been listening to [U.S. Senator 1]'s

16  messages because they sent an FBI f***** out."  He went on to make statements about

17  U.S. Senator 3's death.

18      11.     On September 2, 2022, LEONETTI left seven voicemails in the voicemail

19  box of a phone number for U.S. Representative 1's office.  Among those voicemails were

20  two that I have attempted to transcribe below, with each call in a separate subparagraph.

21  The transcriptions may not be perfect, because some of the terms are not clearly spoken; I

22  may therefore alter my view of what was said after listening to the voicemails again at a

23  later time.  Although I have marked certain portions as "[incomprehensible]" or

24  "[unknown]" at this point, the words spoken by LEONETTI may be comprehensible to

25  me after further playback or using other tools.

26          a.      Okay, so the reason I'm going to murder and barbecue the Capitol

27      Police then, because you're [incomprehensible] you dead f*****! U.S. the state

AFFIDAVIT OF SPECIAL AGENT BENJAMIN LONG – 4
USAO# 2022R01331

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   side, State Department f\*\*\*\*\*\*. And you're doing it in politics, in partisan

2   American domestic politics. You need to get U.S. Department of State state side

3   for f\*\*\*\*\*\*. **So we're going to barbecue your ass. We're going to peel your ass**

4   **inside out.** You stupid cum-sucking g\*\*\* race. And at the end of the day, the

5   Eugene, Oregon BLMs are the bigger colonialists than your MAGAs are anyway.

6   I understand it's a personal score for you after January 6th, you f\*\*\*\*\*\*. But

7   they're still, even those MAGAs from January 6th of 2021 aren't the colonialists

8   that a Eugene BLM is. And you didn't think of it first! You didn't think of

9   militarizing the DOJ first anyway! The guy that thought of doing it against the

10   bigger colonialists thought of it already, too!

11           b.      It's that Kissinger that's laughing at you dead g\*\*\* meats, because

12   he did call it. It's the Rochester you don't make. The only Rochester you would

13   get to get in on, and we wouldn't need these shit f\*\*\*\*\*\* like the Capitol Police

14   for anyway. Nope. By statute, by any other, right, by any other fucking measure

15   either, you don't need f\*\*\*\*\* g\*\*\*s, misfits like your fucking g\*\*\* asses for one,

16   for this or Rochester ever possibly, g\*\*\* fucking f\*\*\*\*\* race. Now what

17   Rochester did you pick up if you're not supposed to be associating with

18   [incomprehensible]? And they want to call themselves professionals still, right?

19   Wait a minute. What g\*\*\* [incomprehensible].  How many do you have? Look at

20   all the tin badges you have. 'Cause it's the wrong one. You go after the MAGAs

21   before you go after the Eugene, Oregon BLMs that way. And it's the wrong move

22   and the [incomprehensible] is in Rochester. I'm not here to defend the MAGAs.

23   **I'm going to murder you f\*\*\*\*\*\* for going the wrong way on Rochester with**

24   **whatever Rochester f\*\*\*\*\*\* you're with.**

25           12.     In the other voicemails, which were not always coherent, LEONETTI made

26   other references to "murder[]" or "kill[ing]."

27

AFFIDAVIT OF SPECIAL AGENT BENJAMIN LONG – 5
USAO# 2022R01331

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

13.      USCP obtained call records and location information for September 2, 2022 from AT&T for the phone number ending in -5817.  The phone toll records show that the user of the -5817 phone number had called the office of U.S. Representative 1 on nine occasions between 11:54 PM PT on September 1, 2022 and 12:22 AM PT on September 2, 2022, and most recorded location information was within the vicinity of the **Subject Premises**.

14.      After these voicemails, on a date between September 12 and 15, 2022, LEONETTI was again contacted, this time by emergency mental health workers, at the request of the Longview Police Department.  Two police officers accompanied the EMH workers.  One of the EMH workers reported that, during her conversation with LEONETTI, she informed him that his voicemails were threatening; he did not deny as much.  He denied owning a firearm but claimed to possess other weapons.  He denied any intent to go to D.C. or harm others.  LEONETTI also made other statements during this conversation that were nonsensical.

15.      Between September 23 and 25, 2022, LEONETTI left 32 voicemails in the voicemail box of a phone number for U.S. Senator 1's office.  My rough transcription of three of those calls are below, with each call in a separate subparagraph.  The same caveats noted above about my transcriptions apply.  In these voicemails, LEONETTI appears to refer several times to his visit, two weeks earlier, from the EMH workers with Longview police officers.

a.      So they said "she." They gave up "she." Does that leave what, does that leave Feinstein this time? If it doesn't leave [U.S. Representative 1]. Maybe it was [U.S. Representative 1] instead of you, you filthy f***** fucking g*** race whore. **Well, so I'm gonna murder you. It is justified.** You go ahead, you circumvent the feds again whore! When you do forget to tell them he might be the von Braun murderer already! Again, justified murder!

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

b.      Now, dead, dead g*** meat. Uh, we're gonna follow, we're gonna murder the Longview Police f****** right back to you. Guess how? Guess who rips already with both [unknown] and [unknown]. Stupid dead whore. You called the locals. You called. Okay. Wasn't [U.S. Representative 1], [U.S. Representative 1] did? Too bad it wasn't you. We'd have followed you. We'd have followed them right back to Minnesota. You sure it wasn't you and Jesse Ventura stuff you called the locals about in a Charles Turner, uh, Weekend at Bernie's. **Are you sure it wasn't you? Please be you bitch. Please be.** You stupid Jew meat bitch. Jew meat? I mean, coincidentally, it's American Karen, maybe Adam made you to be as big a Karen as you are K Sax fucking princess. Please have been you [U.S. Senator 1]. Uh, that rep, the Longview Police f****** you did try to alert are already with [unknown] and [unknown]. In a, bitch, in a Weekend at Bernie's Charles Turner. **Okay? So I hope it was you. Bye-bye, adios if it was.** And I [bet/get] you delicious g*** meat. Yeah Jew meat or not g*** meat, you know, that's [incomprehensible]. However retarded it is! Rip is a fugitive. "You know you can't murder retards!" Oh yeah, you can't. Fugitive delusionals!  It's a fugitive, fucking delusional! But they're in contempt 'cause every last one of them is a Rajneeshee [incomprehensible] ring and a von Braun g***. They are a von Braun Nazi American fucking joke. Okay? So, like it or not Jew bitch.

c.      Here I am killing Joe because he's a von Braun, a von Braun hypocrite. He is a von Braun hypocrite. Weekend at Bernie's included, otherwise just a American foreign policy hypocrite. Geneva Convention, American foreign policy hypocrite. Okay, well you wanna know why, why I was killing Joe? It's 'cause he was just fighting for things like, [incomprehensible], but I'm a denier so I can't admit it at the same time. Because you are a Hiroshima fucking denier Jew. Hiroshima denier Jew. The von Braun, von Braun, Hiroshima denier Jew whore. K Sax Jew whore. F*****. West German Jew. Yeah. Yeah. Now even if you are

delusional when we murder you, you don't have to sober up to that. **We're just gonna murder you here bitch. The barbecue. Go ahead. You already been delusional all this much of your life, right? But when we barbecue you, maybe you will have been too. Maybe it makes you sushi.** Maybe you'll be like [unknown] for it.

16.     That these phone calls referred to the Longview Police Department and accused U.S. Senator 1 of having "called the locals," just days after LEONETTI was visited by EMH workers in coordination with the Longview Police Department and in response to voicemails left at another politician's office, also circumstantially establishes that these voicemails were left by LEONETTI with the purpose of threatening or with the knowledge they would be perceived as threatening.

17.     From October 15-19, 2022, Leonetti left seven voicemails in the voicemail box of a phone number for U.S. Senator 2's office.  My rough transcription of one of those calls is below.

        a.      Okay so they wanted the Jew bred out of you before they
        barbecued you, without your being in office.  That's what they want you
        holding public office.  That might be the January 6th on you, there could be
        a ton of them.  Maybe Hatfield is, maybe Gordon is, maybe just Muriel
        Bowser, not in a state, Muriel Bowser of the mayor's office is.  Where are
        you trying to work out of right now?  Is DOJ there with you?  How about
        Muriel Bowser?  She is still too, yes DOJ, for the duration of it, till you're
        barbecued brother.  I get.  Is that Capitol Police jurisdiction?  No, not what
        they caught you in, [U.S. Senator 2], no.  Now it's also Charles Turner
        statute, if you got it from the wrong Mark Hatfield, especially via Gordon
        Smith.  You hear about that?  Is that the Tualatin Valley fire and rescue
        firehouse we murdered all you f****** at?  Out of?  You tried to occupy it.
        **And what do we do to you with you there?  That's why we do that.  We**

1   **peel you, inside out, it's called a Fort Vanc—cause you must not be**

2   **from town, it's a Fort Vancouver lollipop, and you eat the meat off the**

3   **inside, and they can come and fart and piss and shit on itself, all over**

4   **its face, at the same time, and get it right?**  It's real Fort Vanc, Fort

5   Vancouver lollipop, f*****, yeah.  I don't know if that's the Hollywood

6   lollipop guilds, are calling you, that's what Fort Vancouver calls you.

7   Maybe that's the difference between us and them, maybe they're calling

8   you the same thing we are, partner.  I don't know.  Do you know it had to

9   do with Hollywood?  'Cause then from there it's to the [incomprehensible]

10  American oligarch.  I'm not with the Russians.  Those fight club American

11  oligarchy and a few other things.  Uh, I get out of the Russians' way

12  because it's also the American oligarchy, and [Cruz/Cruise], and he's the

13  known propagandist too.  And he might have tried to run to Ukraine.  Was

14  he running from the Russians to Ukraine, instead of from me there, we

15  don't know.  Or do you, you know?  It's both of them, they weren't even

16  working [incomprehensible] each other.  What explains to the fire, [cuts

17  out] here's why the feds are gonna make sure you get fucking barbecued

18  right, what's left of you, [U.S. Senator 2].  What did you set Biden up for?

19  What did you set Biden up for this week?

20      18.     On October 26, 2022, Leonetti left four voicemails in the voicemail box of

21  a phone number for U.S. Representative 2's office.  My rough transcription of two of

22  those calls is below, with each call in a separate subparagraph:

23          a.      So you, you aren't then a greaseball Hitlerini, because you're

24  a Jew.  Because you're a Hitler Jew.  Hitlerini Jew or whatever.  So

25  technically you're not Iranian enough to be Hitlerini.  You little Hitler Jew,

26  yeah he's a little Hitler Jew, to [incomprehensible] to be Hitler Jew, you

27  mean.  You gotta [incomprehensible] was the Hatfield Rajneeshee.

1   Hatfield Democrat Rajneeshee.  If Kissinger's signing off on it, it's not

2   clinical, neither is Kinskey.  If not, we can definitely notarize that, you Jew

3   blood idiot, obviously you played right into it.  **Jew mouth.  Jew blood.**

4   **We need to get you back to Israel so we can kill you there**, otherwise

5   someone [incomprehensible] will beat us to it, because there's plenty of

6   statutes that apply to you by now.  You worthless fucking Jew mouth.  Why

7   aren't you a Hitlerini, then?  You think you're gonna suck of Schulz, and

8   not be a Hitlerini?  Wait, your Schulz is Hitlerini.  I've found out which

9   Hitlerini she is, if she's a Hitlerini you must be.  You won't

10  [incomprehensible] "I can't! I'm a Jew capo!  You can't call me a Hitlerini.

11  I'm the Jew capo sucking off Schulz.  You thought Zelensky was.  Well,

12  what does that make [U.S. Representative 2]?

13          b.      **So Leonettis have always killed [U.S. Representative 2's**

14  **last name]s before, and it has never had anything to do with the**

15  **Holocaust.**  In fact, even through it when [U.S. Representative 2's last

16  name]s were sucking off Shulzes, and Leonettis were killing Schulzes, too.

17  **Since before the Holocaust, Leonettis have always killed [U.S.**

18  **Representative 2's last name]s and Schulzes.  That's why it's not déjà**

19  **vu for you now, either maybe, f*****.**

20          19.     The earliest calls from LEONETTI's -5817 phone number to a political

21  official in 2021 that I am aware of occurred in February 2021, to U.S. Representative 2's

22  office.  The latest calls from that phone number occurred just one week ago, on

23  December 5, 2022, to U.S. Senator 4's office.  The latest calls included additional

24  statements about "murder" and "kill[ing]" individuals.

25  **B.     Connection of LEONETTI and Leonetti's device to the Subject Premises**

26          20.     As described above, in addition to public-records checks showing that

27  LEONETTI's address is the **Subject Premises**, law enforcement has on two occasions

AFFIDAVIT OF SPECIAL AGENT BENJAMIN LONG – 10
USAO# 2022R01331

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    visited LEONETTI at that address, in March 2021 and September 2022 (on the latter

2    occasion, with mental health emergency workers).  A third contact occurred in late June

3    or early July 2021, when local mental health emergency workers visited LEONETTI at

4    his address.  In addition, the subscriber address provided by AT&T for the phone number

5    associated with LEONETTI—the phone number ending in -5817—is the **Subject**

6    **Premises**, and LEONETTI was the named subscriber.  Finally, on at least two occasions,

7    in March 2021 and September 2022, the USCP obtained location information from

8    AT&T, for the device using the phone number ending in -5817, for the time period when

9    threatening phone calls were made.  Several of the pings (location information) provided

10   placed the device using that number either within or very close to LEONETTI's

11   residence.  Thus, there is probable cause to believe that LEONETTI resides in the

12   **Subject Premises**.

13        21.    Based on my training and experience, individuals commonly have within

14   their primary residence evidence of their residency, such as mail or documents with their

15   name on it, or other documents indicating dominion and control.  For the reasons given

16   above, there is probable cause to believe the **Subject Premises** contains evidence of

17   LEONETTI's dominion and control over that residence.  Given that at least the

18   threatening phone calls to U.S. Representative 1 were placed near or within that

19   residence, that evidence of dominion and control is also circumstantial evidence that

20   LEONETTI placed those phone calls.

21        22.    For many of the same reasons, there is probable cause to believe that the

22   device or devices LEONETTI used to make the threatening phone calls described above

23   is contained in that residence.  LEONETTI has admitted previously that the phone

24   number ending in -5817 is his phone number.  As noted, location information during one

25   series of calls to U.S. Representative 1 in early September 2022 showed the device using

26   that -5817 phone number to be within or near to LEONETTI's residence.  And in March

27   2021, when LEONETTI was interviewed at his residence, he retrieved a phone from

AFFIDAVIT OF SPECIAL AGENT BENJAMIN LONG – 11

USAO# 2022R01331

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   within the house and purported to "record" the conversation.  I believe the **Subject**

2   **Premises** is LEONETTI's residence for the reasons outlined above, and in my experience

3   most individuals keep their cell phones with them in their residence when they are within

4   that residence.  Finally, I am unaware of any other individual living within the house, and

5   I have received no information that anyone else was present during any of the prior

6   contacts with LEONETTI.  I did not see anyone else at the residence, or signs that

7   someone else was living there, when I visited LEONETTI in March 2021.  According to

8   the county assessor's office, the residence is only 720 square feet.

9         23.     LEONETTI's cell phone devices are likely to contain evidence of

10   LEONETTI's crimes.  For example, based on my training and experience, I know that:

11           a.     The assigned number to the cellular telephone (known as the mobile

12   directory number or MDN), and the identifying telephone serial number (Electronic

13   Serial Number, or ESN), (Mobile Identification Number, or MIN), (International Mobile

14   Subscriber Identity, or IMSI), or (International Mobile Equipment Identity, or IMEI) are

15   important evidence because they reveal the service provider, allow us to obtain subscriber

16   information, and uniquely identify the telephone. This information can be used to confirm

17   that LEONETTI's cell phone, or which of LEONETTI's cell phones if he has multiple

18   phones, is the phone used to leave the threatening voicemails described in this affidavit.

19           b.     From my training and experience, I know that users of cell phones

20   who purchase new cell phones often transfer data from their old cellular phone to their

21   new phone, to retain valuable information such as contact information, photographs, or

22   text messages.  In addition, I know that even if such a user reassigns his phone number

23   from the old cellular phone to the new cellular phone, the old cellular phone can retain

24   data for some period of time unless the SIM card is removed or the data is otherwise

25   deleted by the user.

26           c.     The stored list of recent received calls and sent calls on one of

27   LEONETTI's cell phones is also important evidence to corroborate that LEONETTI

1    made the phone calls described above.  In addition, given the overwhelming volume of

2    phone calls made by LEONETTI to various political officials—some of which may not

3    be known to the USCP because they were not reported to the USCP—that call history

4    may uncover additional threatening calls or voicemails made or left by LEONETTI.

5           d.     Although LEONETTI's threats described in this affidavit came in

6    the form of voicemails, his stored text messages and emails, in my training and

7    experience, are likely to contain evidence relevant to those threats.  For example, those

8    text messages and emails could help establish who was using the device at the time the

9    voicemails were left.  The text messages and emails also seem likely to contain

10   information helpful to understanding the meaning of some of LEONETTI's threats.

11   LEONETTI's threats often include obscure references to historical events (e.g., the

12   "Rajneeshee" movement in Oregon in the 1980s), other political actors, or local officials

13   in the area where he lives.  This information would be important evidence of

14   LEONETTI's intent, or the objective meaning of the threatening statement.  Given the

15   frequency with which LEONETTI makes references to these things in his voicemails—

16   often multiple times per voicemail—and in conversation, it appears likely that any

17   written communications on his phone would at times delve into the same subject matter.

18          e.     Photographs, videos, and stored documents on his phone would also

19   be evidence of the user of the phone.  For example, a photograph of LEONETTI or

20   LEONETTI's residence taken around the time of the threatening calls described in this

21   affidavit would be circumstantial evidence of the user of the phone at the time of the

22   calls.

23          f.     Stored web browsing history is important evidence because it shows

24   the user's activities, queries, subjects, and places of interest.  Here, that information could

25   include whether LEONETTI looked up particular political officials (including the

26   subjects of the threats described in this affidavit); the phone numbers of their offices

27

AFFIDAVIT OF SPECIAL AGENT BENJAMIN LONG – 13

USAO# 2022R01331

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  (information that was likely obtained via the internet); the historical events or other

2  things described in the threats; or other such information.

3          g.      Finally, stored location data, including from any map applications on

4  the cell phone or portable digital device, are important evidence because the data can

5  show where the user of the phone was during the time of particular phone calls.  Again, if

6  that location information shows the phone was within LEONETTI's residence, that is

7  circumstantial evidence that LEONETTI was the caller.  Such location information would

8  also be evidence that LEONETTI's calls were (or were not) interstate.

9                              **BIOMETRIC ACCESS**

10         24.    The warrant I am applying for would permit law enforcement to obtain

11  from certain individuals the display of physical biometric characteristics (such as

12  fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to

13  search and seizure pursuant to this warrant.  I seek this authority based on the following:

14         a.      I know from my training and experience, as well as from

15  information found in publicly available materials published by device manufacturers, that

16  many electronic devices, particularly newer mobile devices and laptops, offer their users

17  the ability to unlock the device through biometric features in lieu of a numeric or

18  alphanumeric passcode or password. These biometric features include fingerprint

19  scanners and facial recognition features. Some devices offer a combination of these

20  biometric features, and the user of such devices can select which features they would like

21  to utilize.

22         b.      If a device is equipped with a fingerprint scanner, a user may enable

23  the ability to unlock the device through his or her fingerprints. For example, Apple offers

24  a feature called "Touch ID," which allows a user to register up to five fingerprints that

25  can unlock a device. Once a fingerprint is registered, a user can unlock the device by

26  pressing the relevant finger to the device's Touch ID sensor, which is found in the round

27  button (often referred to as the "home" button) located at the bottom center of the front of

AFFIDAVIT OF SPECIAL AGENT BENJAMIN LONG – 14

USAO# 2022R01331

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    the device. The fingerprint sensors found on devices produced by other manufacturers

2    have different names but operate similarly to Touch ID.

3           c.      If a device is equipped with a facial recognition feature, a user may

4    enable the ability to unlock the device through his or her face, iris, or retina. For example,

5    Apple offers a facial recognition feature called "Face ID."  During the Face ID

6    registration process, the user holds the device in front of his or her face. The device's

7    camera then analyzes and records data based on the user's facial characteristics. The

8    device can then be unlocked if the camera detects a face with characteristics that match

9    those of the registered face. Facial recognition features found on devices produced by

10   other manufacturers have different names but operate similarly to Face ID.

11          d.      While not as prolific on digital devices as fingerprint and facial-

12   recognition features, both iris and retina scanning features exist for securing devices/data.

13   The human iris, like a fingerprint, contains complex patterns that are unique and stable.

14   Iris recognition technology uses mathematical pattern-recognition techniques to map the

15   iris using infrared light. Similarly, retina scanning casts infrared light into a person's eye

16   to map the unique variations of a person's retinal blood vessels. A user can register one

17   or both eyes to be used to unlock a device with these features. To activate the feature, the

18   user holds the device in front of his or her face while the device directs an infrared light

19   toward the user's face and activates an infrared sensitive camera to record data from the

20   person's eyes. The device is then unlocked if the camera detects the registered eye.

21          e.      In my training and experience, users of electronic devices often

22   enable the aforementioned biometric features because they are considered to be a more

23   convenient way to unlock a device than by entering a numeric or alphanumeric passcode

24   or password. Moreover, in some instances, biometric features are considered to be a more

25   secure way to protect a device's contents. This is particularly true when the users of a

26   device are engaged in criminal activities and thus have a heightened concern about

27   securing the contents of a device.

AFFIDAVIT OF SPECIAL AGENT BENJAMIN LONG – 15

USAO# 2022R01331

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    f.    As discussed in this affidavit, based on my training and experience

2  and the facts in this case, I believe that one or more digital devices will be found during

3  the search. The passcode or password that would unlock the device(s) subject to search

4  under this warrant is not known to law enforcement. Thus, law enforcement personnel

5  may not otherwise be able to access the data contained within the device(s), making the

6  use of biometric features necessary to the execution of the search authorized by this

7  warrant.

8    g.    I also know from my training and experience, as well as from

9  information found in publicly available materials including those published by device

10  manufacturers, that biometric features will not unlock a device in some circumstances

11  even if such features are enabled. This can occur when a device has been restarted,

12  inactive, or has not been unlocked for a certain period of time. For example, Apple

13  devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed

14  since the device was last unlocked or (2) when the device has not been unlocked using a

15  fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156

16  hours. Biometric features from other brands carry similar restrictions. Thus, in the event

17  law enforcement personnel encounter a locked device equipped with biometric features,

18  the opportunity to unlock the device through a biometric feature may exist for only a

19  short time.

20    h.    In my training and experience, the person who is in possession of a

21  device or has the device among his or her belongings at the time the device is found is

22  likely a user of the device. However, in my training and experience, that person may not

23  be the only user of the device, and may not be the only individual whose physical

24  characteristics are among those that will unlock the device via biometric features.

25  Furthermore, while physical proximity is an important factor in determining who is the

26  user of a device, it is only one among many other factors that may exist.

27

AFFIDAVIT OF SPECIAL AGENT BENJAMIN LONG – 16
USAO# 2022R01331

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1          i.          Due to the foregoing, I request that if law enforcement personnel

2     encounter a device that is subject to search and seizure pursuant to this warrant and may

3     be unlocked using one of the aforementioned biometric features, and if law enforcement

4     reasonably believes LEONETTI is a user of the device, then—for the purpose of

5     attempting to unlock the device in order to search the contents as authorized by this

6     warrant—law enforcement personnel shall be authorized to:(1) press or swipe the fingers

7     (including thumbs) of LEONETTI to the fingerprint scanner of the device; and/or (2)

8     hold the device in front of the face and open eyes of LEONETTI and activate the facial,

9     iris, or retina recognition feature.

10          j.          In pressing or swiping an individual's thumb or finger onto a device

11    and in holding a device in front of an individual's face and open eyes, law enforcement

12    may not use excessive force, as defined in *Graham v. Connor*, 490 U.S. 386 (1989);

13    specifically, law enforcement may use no more than objectively reasonable force in light

14    of the facts and circumstances confronting them.

15    //

16    //

17    //

18

19

20

21

22

23

24

25

26

27

## CONCLUSION

25.     Based on the foregoing, I submit there is probable cause to believe that contained within the **Subject Premises** described in Attachment A (including the cellular telephones described in Attachment A) there exists evidence, fruits, and instrumentalities, as described in Attachment B, of violations of 18 U.S.C. § 875(c) (interstate communication of threats) committed by Mark LEONETTI.

Benjamin Long, Affiant
Special Agent, FBI

The above-named agent provided a sworn statement to the truth of the foregoing affidavit by telephone on the 12th day of December, 2022.

THE HON. J. RICHARD CREATURA
Chief United States Magistrate Judge

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## ATTACHMENT A

## Location to Be Searched

The property to be searched consists of the following location:

      a.     283 19th Avenue, Longview, Washington 98632, a single-family residence (the **Subject Premises**), as depicted below.



The authority to search extends to all parts of the property, including main structure, garages, storage structures, outbuildings, and all vehicles, containers, compartments, or safes located on the property, whether locked or not, where the cellular phones (including smart phone) described in this Attachment A or the items described in Attachment B (list of items to be seized) could be found.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

b.      Any cellular telephone (including smart phones) within the **Subject Premises** described in Paragraph a of this Attachment A that is capable of containing and reasonably could contain fruits, evidence, contraband, or instrumentalities described in paragraph 3 of Attachment B, and that law enforcement has reason to believe is owned or used by Mark LEONETTI.

**ATTACHMENT B**

**Particular Things to be Seized**

This warrant authorizes the seizure of the following evidence, fruits, and/or instrumentalities, in whatever form and however stored, of the commission of violations of 18 U.S.C. § 875(c) (interstate communication of threats) committed by Mark LEONETTI, from between January 1, 2021 and the present:

1.      Evidence of dominion and control over the **Subject Premises** described in Paragraph a of Attachment A.

2.      Any cellular telephone that law enforcement has reason to believe is owned or used by Mark LEONETTI, and that is capable of containing and reasonably could contain the evidence described in Paragraph 3 of this Attachment B.

3.      For any such cellular telephones, the following information and/or records for the period January 1, 2021 through the present:

a.      Assigned phone number and identifying telephone serial number (ESN, MIN, IMSI, or IMEI);

b.      Stored list of recent received, sent, and missed calls;

c.      Stored contact and address information;

d.      Stored photographs, videos, or documents/files that are evidence of the user of the device or of the commission of violations of 18 U.S.C. § 875(c), including any embedded GPS data associated with those photographs;

e.      Stored text messages—including Apple iMessages, Blackberry Messenger messages, Facebook messenger, or other similar messaging services where at least some messages or data is stored on the telephone—that are evidence of the user of the device or of the aforementioned crimes of investigation;

f.      Stored emails that are evidence of the user of the device or of the aforementioned crimes of investigation;

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

g.      Stored voicemails that are evidence of the user of the device or of the aforementioned crimes of investigation;

h.      Stored web browsing history that are evidence of the user of the device or of the aforementioned crimes of investigation;

i.      Stored location data, including from any map applications on the cell phone.

j.      Evidence of who used, owned, or controlled the cellular telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence.

To be clear, this warrant authorizes law enforcement agents, including sworn and non-sworn personnel, to review and search (on or off-site) the cellular telephones described in Paragraph 2 of this Attachment B for the fruits, evidence, information, contraband, or instrumentalities described in Paragraph 3 of this Attachment B without seeking additional authorization to do so.

This review may be conducted by any federal or local government personnel, sworn or non-sworn, assisting in the investigation, who may include, in addition to law enforcement officers and agents, federal and local contractors and support staff, attorneys for the government, attorney support staff, and technical experts. Pursuant to the requested warrant, the FBI may deliver a complete copy of the electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

During the execution of the search of the **Subject Premises** described in Attachment A, if law enforcement encounters a smartphone or other electronic device equipped with a biometric-unlock feature, and if law enforcement reasonably believes

Mark LEONETTI is a user of the device, then—for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant—law enforcement personnel are authorized to: (1) press or swipe the fingers (including thumbs) of Mark LEONETTI to the fingerprint scanner of the device; and/or (2) hold the device in front of the face and open eyes of Mark LEONETTI and activate the facial, iris, or retina recognition feature.

In pressing or swiping an individual's thumb or finger onto a device and in holding a device in front of an individual's face and open eyes, law enforcement may not use excessive force, as defined in *Graham v. Connor*, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.